IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DIRECTIONAL BORING SERVICES, LLC,
PEYTON CAGE LINDSAY                                                      PLAINTIFFS


VS.                                              CIVIL ACTION NO.: 3:24-CV-00285-MPM-RP


CITY OF OXFORD, MISSISSIPPI                                              DEFENDANT


## ORDER

This cause comes before the court on the motion of defendant City of Oxford for

summary judgment, pursuant to Fed. R. Civ. P. 56.  Plaintiffs Directional Boring Services, LLC

("DBS") and Peyton Lindsay have responded in opposition to the motion, and the court, having

considered the memoranda and submissions of the parties, is prepared to rule.

This is a 42 U.S.C. § 1983 case in which the primary dispute relates to a decision by a

City of Oxford engineer to remove DBS from a project in which it was laying fiber optic cable

for C-Spire and to prohibit it from working for the City any further.  In discussing the nature of

the work which it performed in this case, DBS asserts in its amended complaint that:

> 15. DBS is a subcontractor hired by various cable companies to drill and bore horizontal
> tunnels through the earth, and to then reinforce those horizontal tunnels with conduit,
> through which other cables, such as fiber optic cables, phone lines, etc. can be run.  * * *
> 19. C-Spire is a provider of fiber optic Internet services. From time to time, C-Spire
> contracts with various municipalities to install fiber optic cable throughout that
> municipality. The fiber optic cable is installed underground. C-Spire, itself, does not drill
> the holes or reinforce the holes with conduit. Instead, C-Spire subcontracts that work to
> other companies who act as general contractors.
> 20. One of the general contractors with whom C-Spire works to run the underground
> cables is SOT solutions, LLC ("SOT") out of Brookhaven, Mississippi. SOT has its own
> crews that sometimes drill the holes and run the cables and connect them. However,
> sometimes SOT does not actually "dig" the holes or perform the horizontal drilling, or the

1

running of the conduit through which the cables will eventually run. Instead, SOT, on occasion, subcontracts the actual drilling and reinforcing of the tunnels to other companies.

21. One of the companies to whom SOT contracts out certain drilling work is one of the Plaintiffs herein, Direct Boring Services, LLC, based in Oxford, Mississippi.

22. In October 2021 , SDT entered into a "Master Services Agreement" with DBS whereby DBS would perform horizontal drilling services for SOT at various locations in Mississippi in which SOT had been employed by C-Spire to run fiber optic cable.

[Amended complaint at 4-5].

In describing the problem which arose in the performance of the contract for the laying of

fiber optic cables in the City, the amended complaint asserts that:

27. On August 23, 2022, DBS began its work horizontally drilling in Oxford, Mississippi pursuant to the permit that had been issued to C-Spire.

28. At 10:15 on the morning of February 21, 2023, (a Tuesday morning) C-Spire inspector Hal Lucius, informed Casey Lindsay with DBS that Russ Heard, the City of Oxford Assistant Engineer ("Heard") had driven by some of the work that had been drilled, *yet not completed,* and informed him (Lucius) that DBS had to stop its drilling and go back and cover the holes that it had previously dug with sod.

29. Also upon information and belief, Defendant Mayoral, the Oxford City Engineer, and/or Defendant Russ Heard, the Assistant City Engineer, contacted Oxford City, Police Department Officer Sossaman, and demanded that he order DBS to cease its activities within the City of Oxford until the disturbed ground, about which the complaint had been made, was resodded even though the cable had not yet been run through the conduit in that particular hole.

30. Realizing the absurdity of the request, Lindsay contacted the general contractor, SOT (through Dale Hart) and informed him as to what was being asked. Hart informed Lindsey that he would contact Heard and, "take care of it."

31. About 20 minutes later, Lindsey was contacted by Hart and was told by Hart that Hart would get a pallet of sod and put around the Hand Holes that Heard was complaining about and that Lindsey should continue drilling.

[*Id.* at 6-7].

In further setting forth their version of the facts in this regard, plaintiffs allege in their

amended complaint that:

32. Later that day, at approximately 2:15 that afternoon, Heard and Oxford City Police Officer Sossaman pulled up at the location where Lindsey was drilling. Defendant Sossaman, acting in his official capacity as a City of Oxford Police Officer, ordered Lindsay that he was to, "Load up your equipment and get out."

2

33. At the time that Lindsay was ordered to, '·load up his equipment and get out," he was not breaking any laws. Moreover, be was acting completely within the parameters of the permit, and the permit had not been revoked and/or suspended. This adverse action, taken under color of state law, and at the direction of "policy makers", was contemplated by the governing laws pertinent to this action, and constitutes both an intentional tortious inference with the contract between DBS and SDT, and a violation of 42 USC section 1983.

34. This illegal use of the police force was admitted by Russ Heard, Assistant City Engineer, in a notation above certain photographs he supplied to the Oxford City Council (photos #1, #3 and #4 in Exhibit 4 attached hereto). The notation above photograph #l admits that it was City Engineer Reanna Mayoral's idea to illegally use the Oxford Police Department specifically, Office Sossaman, to interfere with DB S's contract with SDT by using the City of Oxford Police Department to order DBS to stop work on the project.

[*Id.* at 8].

In describing DBS' interactions with City officials, the amended complaint alleges that

the highest-level municipal employee with whom it attempted to plead its case was the City's

Chief Operating Officer Bart Robinson, who is not a defendant in this case. Specifically,

plaintiffs allege that:

36. When DBS had been ordered by Officer Sossaman to stop work and get its equipment out of there, DBS stopped work, and Casey Lindsay went to City Hall to try and speak with the City Engineer, Reanna Mayoral, about the incident to try and work something out.

37. At that time, Mr. Lindsay was told that Reanna Mayoral was in a meeting and could not meet with him. Mr. Lindsay left his name and number with the secretary and asked that Ms. Mayoral to call him. Since the job had been shut down by the Oxford Police Department, employees of DBS went to MLK (the location about which the complained area was located) and began trying to dress up the area. At the same time, Mr. Lindsay remained at City Hall awaiting a callback from Ms. Mayoral. It never came.

38. The first thing the following day, at approximately 8 AM, February 22, 2023, Mr. Lindsey went to City Hall to get an appointment with Bart Robinson, the COO of Oxford (the Mayor was unavailable). Mr. Lindsay was unable to get in touch with Mr. Robinson until later that day, when Mr. Lindsey did meet with Mr. Robinson and explain the situation to him.

39. Also on February 22, 2023, after the complained - about area near MLK was cleaned up, DBS attempted to get back to work drilling. At that same time, Russ Heard with the City of Oxford informed him that DBS could not continue working until approval had been given by the City Engineer (Mayoral) to proceed. Later that same day (the 22nd), Ms. Mayoral contacted Mr. Lindsay and informed him that they (the City) could not have a meeting with him until February 28, 2023 - 6 days later - so that C-Spire could be there so they could discuss "recurring incidents".

3

40. Also, on the 22nd, Mr. Heard, apparently, went to the locations where DBS had been drilling when ordered to stop by Officer Sossaman. It is at that time that it is believed that Mr. Heard took photograph #4. The notation above photograph #4 states, "boring machine still on job site Wednesday, 2/22/23 after being told the previous day by Sossaman to get it off job site." This notation constitutes an admission by the City of Oxford of three things: I) the City intentionally interfered with DBS's contract with SDT; 2) the City used the Oxford Police Department as its agent to interfere with DBS's business activities; and 3) the city of Oxford's malicious intent to permanently prevent DBS from completing its contract with SDT.

41. The next verbal notice given to DBS that it would not be allowed to continue working on the project in Oxford was several days later (February 28, 2023) in a meeting at City Hall in Oxford, when Reanna Mayoral, the City Engineer, told Casey Lindsay with DBS that she did not want DBS working in Oxford, regardless of DBS's agreement with SOT or C-Spire, or how well DBS performed its work. On several occasions during the meeting, she said words to the effect, "I don't see how this goes forward", and "I don't know how I have you working on a site."

42. As a result, DBS lost its contract for the Oxford job with SDT.

43. At all times relevant herein, the acts and omissions of the Defendants were pursuant to the customs, policies, practices, and/or procedures of the City of Oxford via its City Engineering Department in collaboration with its law-enforcement entity, the Oxford City Police Department, and their policymakers.

44. At all times, relevant here, each Defendant acted under the color of the laws, statutes, and regulations of the State of Mississippi, and the City of Oxford.

[Amended complaint at 9-10].

It is thus apparent that, while the amended complaint asserts that the Oxford Mayor was "unavailable," it provides no indication that DBS persisted in attempting to make contact with her, nor does it allege that plaintiffs even attempted to file any sort of appeal with either the Mayor or the Board of Aldermen regarding the decisions made by City Engineer Mayoral.

In providing its own version of events, the City writes in its brief that:

The City issued DBS a notice to proceed with drilling on August 23, 2022, which included several conditions DBS was to follow. Notice to Proceed, Ex. P. Relevant conditions included the requirements that DBS:
- "repair any and all damage to pavements, curbs, sidewalks, and sod… to a condition as good, or better than existing. The city will inspect the site before and after work for compliance with this condition…"
- "be responsible for the safe flow of traffic on all city streets and shall take whatever means necessary to ensure such."

4

> *Id.*
> Several months into the drilling, DBS's work led to several complaints to the City about damage and traffic. Oxford Depo. Tr. at p.21, Ex.D; Heard Notes, Ex. E. DBS's drill broke a sewer line on Chickasaw Road on October 14, 2022. Heard Notes, Ex. E. DBS struck another sewer line on Cherokee Drive on October 27, 2022. *Id.* On November 10, 2022, DBS struck a gas line around Price Street. *Id.*
> Around one week later, DBS parked trucks in the middle of a curve on a hill. *Id.* When instructed to have flagmen direct traffic in accordance with the notice to proceed, DBS's owner, Casey Lindsay, stated he did not need to have flagmen according to state law. *Id.* Over the month of December 2022, DBS left conduit lines in private yards and uncovered holes along the street. *Id.* In February of 2023, although told several times to clean it up, much of DBS's damage remained on City property. *Id.*
> As a result of all these incidents, Russ Heard, assistant engineer for the City, told DBS to cease drilling on February 21, 2023, until all holes were dressed up or sod replaced. Hal Lucius, an inspector hired by C-Spire stated that he had told them not to start drilling again but that he had been "overruled" by SDT. Officer Sossaman of the Oxford Police Department instructed DBS to stop work, remove the equipment, and not work again until it was fixed. Id. at 2:27-3:46. Casey Lindsay replied that he "probably wouldn't be working [in Oxford] no more" and called SDT asking for additional work because "he [was] done in Oxford." Id. at 2:57-4:06.
> One week later, Reanna Mayoral, City Engineer, met with Lindsay. DBS. Discovery Resp. at Int. 6, Ex. G; Meeting Recording, Ex. H. In that meeting, DBS alleges that Mayoral said that she did not know how DBS could proceed on the project given the multitude of incidents caused by DBS's drilling. DBS. Discovery Resp. at Int. 6, Ex. G. While DBS claims it "lost the contract" with SDT as a result of this meeting, their MSA remained intact and the entities continued to do business thereafter. DBS Depo. Tr. at p.31-33, Ex. C.

[City's brief at 3-4].

In arguing that DBS failed to exercise the due process options which were available to it, the City writes in its brief that:

> DBS admits that it was given notice on several occasions. First, on February 21, 2023, DBS alleges that it received word from C-Spire that Heard wanted DBS to cease drilling until it covered up its previously drilled holes. On that same day, DBS alleges Officer Sossaman told DBS to cease drilling completely. There is also the notice to proceed which states that DBS could be made to stop work at any time. The ordinances provide the same. Oxford Code of Ordinances at Sec. 98-172, Ex. M. DBS had plenty of notice that it could be told to stop work and notice prior to being officially taken off the project. Then there was a hearing in the form of the February 28, 2023 meeting between DBS, SDT, C-Spire, and the City. In that meeting, DBS was given notice of the problems the City had with it and was given an opportunity to respond. Feb. 28, 2023 Meeting Recording, Ex. H. According to DBS, Mayoral also gave it notice that they would be taken off the project on that date.

5

> The ordinances also give another right to be heard as it provides for an appeal of any decision to the Board of Aldermen. Oxford Code of Ordinances at Sec. 98-175, Ex. M. DBS refused to take such an appeal, deeming it to be futile.

[City's brief at 13-14 (record citations omitted)].

As is its general practice, this court will first address the federal constitutional claims in this case, since it is these claims which form the basis for this court's jurisdiction over this dispute between Mississippi plaintiffs and the City of Oxford. From reading the parties' submissions, it seems clear that the overriding theme of plaintiffs' briefing is their belief that there should be some law allowing them to recover against the City of Oxford for the acts and omissions of the relatively low-level city employees who, plaintiffs contend, wronged them in this case. Unfortunately for plaintiffs, however, their briefing of the legal issues in this case never comes close to establishing that there actually *is* any legal basis under § 1983 for holding a municipality such as the City of Oxford liable for the actions taken by the city employees in this case, based upon the U.S. Supreme Court's decision in *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978), discussed below. Thus, even if this court were to conclude (which, as discussed below, it does not) that plaintiffs had managed to create fact issues regarding the existence of a constitutional violation in this case, it would still conclude that they have failed to provide this court with any basis for holding the City liable for those violations.

In so stating, this court notes that plaintiffs initially included four municipal employees as defendants in this action: Oxford police officers Johnny Sossoman and Joshua Stockton, Assistant City Engineer Russ Heard and City Engineer Reanna Mayoral. Importantly, however, plaintiffs chose to voluntarily dismiss their claims against these individuals, thereby leaving the

City of Oxford as the sole defendant.[1]  [*See* docket entry 40].  In doing so, plaintiffs ensured that, to recover on their federal claims in this case, it is insufficient for them to establish fact issues regarding the existence of a constitutional violation; they must also establish that some basis for municipal liability under *Monell* and its progeny exists in this case.  This is an exceedingly difficult burden, for reasons which this court will presently explain.

42 U.S.C. § 1983 provides for liability on the part of "person[s]" who commit constitutional violations under the color of state law, and, for decades, U.S. Supreme Court precedent held that municipalities were not "persons" and that, as such, they faced no liability under § 1983.  *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473 (1961).  In its 1978 decision in *Monell*, the Supreme Court overruled this aspect of *Monroe*'s holding and held that municipalities were, in fact, "persons" subject to liability under § 1983, albeit only for their own actions and not, generally speaking, for those of their employees.  *Monell,* 436 U.S. at 701. Thus, while *Monell* is rightly regarded as establishing stringent standards for municipal liability in § 1983 cases, it constitutes a significant expansion of the categorical bar against such liability which had previously existed.

While thus opening the door slightly to recovery against municipalities, *Monell*'s well-settled rule is that municipalities face no vicarious liability under § 1983; rather, the key to establishing municipal liability is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom of the municipality in question.  *Monell*, 436 U.S. at 694.  A "policy or custom" can be either (1) a policy statement, ordinance, regulation, or

---

[1] This court notes that, while plaintiffs cited service of process issues in dismissing these defendants, the scarcity of legal authorities in their briefing suggests that they would have likely had a very difficult time establishing that these individuals violated "clearly established law" under qualified immunity case law.

decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *McGregory v. City of Jackson*, 335 Fed. App'x 446, 448-449 (5th Cir. 2009).

In this court's experience, by far the most common (and easiest) path for a plaintiff to overcome *Monell*'s stringent standard is by demonstrating that a "final policymaker" for a municipality committed the constitutional violation in question. Thus, § 1983 plaintiffs who are able to create fact issues regarding the existence of constitutional violations by, say, a sheriff, may be able to recover against the county, notwithstanding *Monell*'s stringent nature. The list of potential "final policymakers" for a municipality is extremely limited, and, that being the case, the *Monell* doctrine is an often-insurmountable obstacle to municipal liability in § 1983 cases.

This court notes that there are, at least potentially, other potential avenues for establishing municipal liability in § 1983 cases, but they are quite narrow ones. For example, the Supreme Court has held that municipalities may at least potentially be held liable for inadequate training of their police officers, but it made it clear that such inadequacy may serve as the basis for § 1983 liability only "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989). Establishing deliberate indifference in training employees is, generally-speaking, a tall order, since the Supreme Court has made it clear that a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62,

8

131 S. Ct. 1350, 1360 (2011)(citation omitted). Similarly stringent standards apply if a § 1983 plaintiff wishes to prove that deliberate indifference by a municipality in hiring a particular employee caused constitutional injury. Indeed, the Supreme Court has made it clear that, to support recovery under § 1983 in this context, the municipality must have acted with "a conscious disregard for a high risk" that hiring a particular employee would lead to constitutional violations. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 415-16, 117 S. Ct. 1382 (1997).

In the court's experience, § 1983 plaintiffs attempting to establish municipal liability generally choose one (or more) of the above-stated paths available to them under Supreme Court precedent and then provide a discussion of the facts of the case which, in their view, support a finding that the stringent requirements of that path are met. That is not what the plaintiffs in this case have done. To the contrary, the entirety of plaintiffs' *Monell* arguments in this case is that:

**THE CITY IS NOT ENTITLED TO MONELL JUDGMENT ON THE DBS CLAIM[2]**

A municipality is liable when an official policy or the decision of an official with final policymaking authority is the moving force behind a constitutional deprivation. *Monell v. Department of Social Services,* 436 U.S. 658, 690- 94 (1978); *Pembaur v. Ciiy of Cincinnati,* 475 U.S. 469, 480-83 (I 986). Whether an official possesses final authority is a question of state and local law, but authority may be delegated for a particular subject. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123-27 ( 1988).
The City cannot simultaneously contend that its ordinances and Notice to Proceed vested the City Engineer with authority to stop the work and that the exercise of that authority was not municipal action. The evidence permits a finding that engineering made the operative stop decision, enlisted police to enforce it, and left no formal decision for the Board to review. If, as the City argues, the City Engineer possessed authority to stop this work, a jury may find that the challenged decision was municipal policy for this particular function. If the City instead insists there was no authorized decision, that contradiction reinforces Plaintiff's claim that DBS was deprived without the process the City says should have accompanied such a decision.
Independently of the single-decision theory, the City itself identifies its ordinances and

---

[2] This court notes that the fact that plaintiffs' *Monell* briefing is expressly limited to "the DBS claim" suggests that they have no *Monell* arguments to make with regard to Lindsay's claim arising out of his arrest.

9

Notice to Proceed as the official authority governing the deprivation. According to the City, those policies permitted engineering personnel to stop ongoing work immediately, without first issuing a written finding or providing a hearing. Plaintiffs contend that this officially adopted procedure was itself the moving force behind the denial of process. That theory does not depend upon treating every operational decisionmaker as a final municipal policymaker.

The City's Rule 30(b)(6) testimony further establishes that intervention in the relationship between a franchisee and its contractor is an established method by which the City removes contractors from work within the public right-of-way. Crawley testified that when the City has continuing problems with a contractor, the City approaches the franchisee and asks that the contractor no longer be used. The City may hold permits upon which that contractor has been selected, request removal from work under an existing permit, and request that the contractor not be engaged for future permits. Crawley acknowledged that the intended result is to prevent the selected contractor from continuing to work within the City's right-of-way.

This testimony permits a jury to find that the City's intervention was not merely the unauthorized act of a subordinate employee.  It also undermines the City's causation defense: the purpose of the described procedure is to cause the franchisee to remove the contractor from existing work or exclude it from future work. Although Crawley stated that such intervention should occur when public safety or welfare is at risk, he could not testify that the City made any such detem1ination concerning DBS.  That absence is consistent with the City's admissions that no utility strike was ever determined to be DBS's fault, no reimbursement was sought from DBS, and no written stop-work or other reviewable decision was issued.

Causation is likewise disputed. Officer Sossaman ordered the equipment removed; Mayoral stated she did not want DBS working in Oxford; SDT did not immediately issue replacement work; and the Oxford work ended. Casey Lindsay's inability to identify the private actor who formally processed the removal is not an admission that the City did not cause it. The factfinder may draw the natural inference that the City's exclusion from City rights-of-way made continuation of the Oxford work impossible.

[Brief at 10-11].

In contrast to plaintiffs, the City does offer persuasive arguments, supported by Fifth Circuit precedent, that no potential *Monell* liability exists in this case.  Specifically, the City argues that:

Fifth Circuit case law and the City's own ordinances make clear that the Board of Aldermen are final policymakers for the City, not any city employee or even the Mayor. *See Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 381-82 (5th Cir. 2007); *Advanced Tech. Bldg. Solutions, L.L.C. v. City of Jackson, Miss.*, 817 F.3d 163, 166-67 (5th Cir. 2016). The City's Code of Ordinances directs persons who are adversely affected by decisions made about street trenching management to make an appeal that would be heard by the Board of Aldermen and the Mayor. Oxford Code of Ordinances,

10

Sec. 98-175, Ex. M. Once again, DBS declined to pursue this option. Since the Board has the power of final review, the Board is the final policymaker for the city. *See Advanced Tech. Bldg. Solutions, L.L.C.*, 817 F.3d at 167 ("Thus, in multiple cases, we have affirmed that officials are not final policymakers when a supervisory board ahs the authority to accept or reject their decisions."); *Doe v. Burleson Cnty., Tex.*, 86 F.4th 172, 178-79 (5th Cir. 2023) ("Doe fails to establish that Sutherland had the requisite final policymaking authority to hold Burleson County liable for his actions here, regardless of his general ability to make decisions regarding county business."). Although Mayoral, Heard, and Sossaman may have been able to make decisions, policymaking is reserved for the Board.

Finally, there is no evidence that any action from the Board deprived DBS of its constitutional rights nor was any action of the Board the "moving force" behind the alleged constitutional violation.

Ultimately, the City agrees with DBS: there was no municipal action. The result is that DBS cannot satisfy *Monell* and summary judgment is proper.

**b. Lindsay's claims fail under *Monell.***

Like DBS, Lindsay cannot claim that the City is liable for Officer Stockton's conduct under § 1983 pursuant to a *respondeat superior* theory. *Monell*, 436 U.S. 658, 691 (1978). Instead, He must prove municipal liability under *Monell*. Lindsay fails to attach municipal liability to the City for the same reasons that DBS does. Lindsay also has failed to point to any unconstitutional policies or an unconstitutional custom or practice of unlawful seizure, unlawful arrest, or retaliatory arrest. *See* Lindsay Depo. Tr. at p.14, Ex. K. Officer Stockton is not a final policymaker for the City as he is a regular police officer who does not make any policy, so the claim cannot proceed under the single-incident exception either. *See Barnes v. Tarrant Cnty., Tex.*, 2026 WL 796487, at *16 (N.D. Tex. Mar. 2, 2026) ("Barnes does not identify any legal authority, nor is the Court aware of any, that identifies a bailiff, a police officer, or a detention officer as a final policymaker for his municipality."). To the extent that Lindsay attempts to rely on a hiring or training theory, such was not pled and should not be considered. *See generally* Complaint. But it would still fail. Lindsay has no evidence as to Officer Stockton's training or qualifications. *See* Lindsay Depo. Tr. at p.16-17, Ex. K. Officer Stockton was in fact highly trained. Stockton Training Certificates, Ex. N. Lindsay's claim must be dismissed.

[Brief at 23-24].

The City's arguments, heavily supported by precedent, contrast sharply with those offered by plaintiffs. In the court's view, plaintiffs' arguments expressing their mere opinions regarding what the City may or may not validly argue in this case, unsupported by any precedent apart from generalized standards in this context, fall far short of establishing that any of the

narrow exceptions to the general rule of municipal non-liability in § 1983 cases is met. The same applies to plaintiffs' suggestion that there might be something sufficiently unique about the manner in which the City of Oxford handles stop work orders to somehow create an exception to *Monell* which has no apparent basis in Supreme Court precedent. Indeed, plaintiffs appear to take pains to avoid even mentioning any of the narrow paths to establishing municipal liability which actually *are* available to them under the Supreme Court's § 1983 precedent, presumably because they are aware that they could not meet them. This court does not believe that plaintiffs are entitled to provide their own framing of the factors which should be considered by this court in addressing the *Monell* issues in this case, rather, they must use, as a starting point, the *Supreme Court's* framing of the issues in this context.

As discussed previously, the Supreme Court's framing of the issues in this context is to provide a general rule whereby a municipality is liable under § 1983 only for its own acts, such as decisions made by vote of the Board of Aldermen or Board of Supervisors. *See, e.g. Perkins v. Panola Cnty. Bd. of Supervisors*, 709 F. Supp. 3d 260, 267 (N.D. Miss. 2024). The Supreme Court has established certain doctrines, discussed above, which serve to either elaborate on or provide exceptions to that general rule, but they are each subject to stringent requirements set forth in the Court's precedent. That being the case, the proper course of action for any § 1983 plaintiff is to plainly state in briefing exactly what § 1983 doctrine or exception he or she is proceeding under, and to thereupon discuss the precedent applicable thereto and explain why it supports a finding of potential liability.

In this case, plaintiffs instead spend several paragraphs citing certain facts which seek to create a narrative whereby the actions of the City Engineer in this case should be regarded as the official acts of the City of Oxford. Even disregarding the complete absence of authority in these

paragraphs, there is a rather glaring omission in this portion of plaintiffs' briefing, which the City

highlights in its briefing and which this court discusses in greater detail elsewhere in this order.

This omission relates to the fact that:

> The City's Code of Ordinances directs persons who are adversely affected by decisions made about street trenching management to make an appeal that would be heard by the Board of Aldermen and the Mayor. Oxford Code of Ordinances, Sec. 98-175, Ex. M. Once again, DBS declined to pursue this option.

[Defendant's brief at 23.]  Clearly, this fact does not fit within the narrative which plaintiffs are

trying to create in their briefing, and it thus seems clear that their *Monell* arguments are both

lacking in relevant authority and provide a very selective and self-serving recitation of the facts.

This court regards plaintiffs' arguments as most blatantly inadequate as it relates to the

issue of municipal liability for the actions of three of the former individual defendants: Oxford

police officers Sossaman and Joshua Stockton and Assistant City Engineer Heard.  As discussed

previously, *Monell* and its progeny prevent municipal liability for such low-level city employees,

barring truly unusual circumstances which plaintiffs' briefing does not even argue, much less

establish, are present here.  As quoted above, defendant notes in its briefing that the Fifth Circuit

has held in certain decisions that a Board of Aldermen or City Council, and not even the mayor,

was the final policymaker for a city, although this appears to be dependent upon the specific

actions and legal context, rather than being a firm rule of law.[3]  Still, the fact that the Fifth

---

[3] For example, the Fifth Circuit held in a 2016 decision that the Jackson City Council, and not the Mayor, was the final policymaker for the funding decision at issue in that case, writing that:

> Thus, by ATBS's own admission, the city council holds the power of the purse. The obvious conclusion is that the city is likewise the final policymaker for funding decisions. It is true that the mayor can veto council resolutions (and every ordinance passed by the council must be submitted to the mayor for approval or rejection); nevertheless, the council can override a veto, thus giving the council ultimate say. *See* Miss.Code Ann. § 21–8–17(2). Because the council has the right of final review, it is the final policymaker.

*Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson, Miss.,* 817 F.3d 163, 166 (5th Cir. 2016). The Fifth Circuit did not characterize this as a categorical rule, however, which leads this court

Circuit has repeatedly held that city mayors are not final policymakers for a city, *see also Worsham v. City of Pasadena*, 881 F.2d 1336, 1340 (5th Cir. 1989), makes it clear what a difficult burden plaintiff faces in arguing that any of the four individual former defendants in this case should be regarded as such.   Indeed, this court regards the *Monell* issues relating to the actions of these individuals as being so clear that, while it agrees with the City's brief that there are serious weaknesses in plaintiffs' proof that there was a constitutional violation in this case, it is entirely clear that no municipal liability would exist for such violations even if they did occur.

In this vein, this court notes that plaintiffs amended their complaint to assert a claim by Lindsay that Officer Stockton stopped and arrested him in retaliation for his having filed this lawsuit against the City.  [Amended complaint at 14-18].  While this court agrees with the City's arguments that there are a number of factual weaknesses in plaintiffs' proof in this regard, this is essentially irrelevant since plaintiffs chose to dismiss their claims against the individual defendants and proceed against the City itself.  That, in turn, places the burden on plaintiffs to establish that one of *Monell*'s exceptions are met with respect to Officer Stockton's alleged actions, and they have clearly failed to do so.  That being the case, this court does not regard plaintiffs' arguments quoted above as even coming close to establishing this case one of the exceedingly rare ones in which a municipality is subjected to § 1983 liability based upon the actions of relatively low-level employees.

Given that one of the four individual defendants dismissed by plaintiffs - City Engineer Mayoral – is at least a somewhat high-level City employee, this court will briefly discuss some

---

to believe that a city's mayor could, at least potentially, be the final policymaker regarding certain actions if state law or city ordinances gave him or her final authority in the relevant context.

of the *Monell* issues applicable to her actions, even though plaintiffs' fail to adequately do so in their briefing. In this vein, this court notes that plaintiff offers no authority whatsoever suggesting that a City Engineer is even *potentially* a "final policymaker" within the meaning of *Monell*, under any circumstances. This is a rather glaring omission, since this court presumes that most municipalities of any size have an employee with responsibilities similar to those which Mayoral exercised in this case. That being the case, it seems highly likely if the actions of such an employee could even potentially subject a municipality to liability under *Monell*, then plaintiffs would have been able to offer this court authority so stating.

Even assuming, purely for the sake of argument, that a municipality might even conceivably give a Chief Engineer sufficient responsibilities so as to render him or her its "final policymaker," this court believes that plaintiffs would have a poor argument that such is the case with the City of Oxford. In so stating, this court emphasizes that plaintiffs never dispute in their briefing that City of Oxford ordinances provided for a right to appeal decisions made by the Chief Engineer. To the contrary, plaintiffs argue in their brief that:

> The City's position is internally inconsistent. It says no City official ever formally forbade DBS from working, yet faults DBS for not appealing that supposed decision. Section 98- 175 cannot supply meaningful review unless there was an identifiable decision, notice that it was appealable, and a procedure capable of restoring the status quo. [DBS employee] Casey Lindsay testified he did not know the ordinance afforded an appeal and understood the City Engineer's instruction as already accomplished.

[Plaintiffs' brief at 9]. Plaintiffs thus appear to concede that City Engineer Mayoral's decisions in this case were appealable under city ordinances, which is fatal to their already-weak arguments that she served as Oxford's final policymaker in this case.

Clearly, DBS' lack of subjective knowledge that City ordinances provided for a right to appeal Mayoral's decisions does not mean that no such right existed, and this court believes that it is in situations such as these where parties would be well advised to hire legal counsel in order

15

to explore their potential legal remedies. This court further reiterates that, in providing their version of the facts, plaintiffs allege in their amended complaint that:

> 38. The first thing the following day, at approximately 8 AM, February 22, 2023, Mr. Lindsey went to City Hall to get an appointment with Bart Robinson, the COO of Oxford (the Mayor was unavailable). Mr. Lindsay was unable to get in touch with Mr. Robinson until later that day, when Mr. Lindsey did meet with Mr. Robinson and explain the situation to him.

[Amended complaint at 9]. It thus appears to this court that, based on plaintiffs' own description of the facts, Lindsay made minimal efforts to take his objections to Mayoral's decisions "upstream," quite apart from his alleged ignorance of city ordinances and his (apparent) failure to timely secure legal counsel. This leaves plaintiffs in a very poor position to make their argument, completely unsupported by legal precedent, that Chief Engineer Mayoral acted as the final policymaker for the City of Oxford in this case.

More fundamentally, the crucial fact is that the question of whether Mayoral served as the final policymaker for the City regarding the matters at issue in this case is determined based upon the legal authority she exercised on behalf of the City, and not plaintiffs' subjective (and erroneous) understanding of that authority. City ordinances make it clear that Mayoral's decisions were not, in fact, the final word regarding the matters at issue in this case, and it therefore seems clear that she was not acting as the City's final policymaker in this case. This court can discern no other even arguable basis for a finding of municipal liability in this case, and the City's motion for summary judgment is therefore due to be granted, as to the actions of all four former defendants, based upon the application of *Monell* and its progeny.

While it is therefore unnecessary to delve into the issue of whether fact issues exist regarding whether any of these four former defendants did, in fact, commit a constitutional violation in this case, this court agrees with the City's argument that none of them did so. Given

16

that this constitutes a purely cumulative basis for dismissing plaintiffs' federal claims against the City, this court will adopt defendant's thorough arguments on this issue as its own, but it wishes to emphasize an additional, and broader point, in this context as well. That point relates to the stringent nature of the substantive legal standards which apply in determining whether the acts of governmental employees violated the U.S. Constitution. These substantive standards make it exceedingly difficult for plaintiffs to create fact issues regarding any constitutional violation by City employees, quite apart from the application of the *Monell* doctrine.

In *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L.Ed.2d 662 (1986), for example, the U.S. Supreme Court held that the Due Process Clause of the Fourteenth Amendment is not implicated by a simple lack of due care on the part of an official causing injury to life, liberty or property. In other words, where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required. In the companion case of *Davidson v. Cannon*, 474 U.S. 344 (1986), the Supreme Court applied its holding in *Daniels* to bar claims for physical injuries suffered by a plaintiff as a result of a prison officer's negligent failure to protect him from an attack by another inmate. In so ruling, the Supreme Court wrote that:

> Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent. *Daniels*, at 331–333, 106 S.Ct., at 665–666. Far from abusing governmental power, or employing it as an instrument of oppression, respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note. The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.

*Davidson*, 474 U.S. at 347–48.

This court notes that *Daniels* involved a procedural due process action, and it is therefore plain that, in this case, plaintiffs must demonstrate that any lack of due process which, they

17

claim, arose in this case resulted from something more than simple negligence on the part of city employees. This court does not believe that plaintiffs are able to make such a showing in this case, particularly in light of Lindsay's own failure to more aggressively research and pursue the appellate remedies available to him, or even to persist in seeking a meeting with the Mayor. Clearly, these facts make it quite difficult for plaintiffs to argue that the City was intentionally seeking to deprive them of their appellate rights or to hide the existence of those rights from them, even if this court is to assume, purely for the sake of argument, that a certain degree of negligence existed with regard to city employees' failure to be more proactive in this regard.

Moreover, any substantive due process claim based upon the allegedly arbitrary nature of the decision to prevent DBS from continuing to work for the City must likewise confront extremely stringent standards. Indeed, the U.S. Supreme Court has made it clear that "[o]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 1716 (1998), citing *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1992). Even considering the evidence in the light most favorable to plaintiffs, this court can discern nothing in the actions of Mayoral or any other city employees in this case which might be regarded as sufficiently egregious to be "arbitrary in the constitutional sense" within the meaning of *Lewis*.

As quoted above, the City cites several issues relating to the manner in which DBS was performing its work on the project in this case, and it appears that its employees had entirely genuine concerns that it was not sufficiently complying with instructions issued by City employees. Even if this court is to assume for the sake of argument that Mayoral or other City employees misperceived the true facts regarding any deficiencies in DBS's work or that they failed to show sufficient patience in allowing it to correct any issues, it can discern nothing in the

record which indicates that any City employee was acting out of any improper motive in evaluating its performance in this case or in deciding how to react to perceived deficiencies in its work. To the contrary, the record supports a conclusion that City employees genuinely believed, perhaps mistakenly, that numerous deficiencies existed in DBS's work and that it was not being sufficiently cooperative in addressing those deficiencies.

Thus, even if this court is to assume that Mayoral made the "wrong call" in ordering DBS to stop work on the project, it can discern no basis for concluding that her decision in this regard was sufficiently egregious to be arbitrary in a constitutional sense. In this vein, this court notes that, if plaintiffs had a federal constitutional claim every time a municipal employee made a "wrong call" resulting in economic harm to them, then this would serve to federalize a large number of disputes regarding such mundane matters as health code violations and work on city contracts. In so stating, this court notes that there are a wide variety of contexts in which city engineers, health officers, or other such employees are required to make judgment calls regarding code violations and other such matters, and it seems clear these judgment calls will often have a significant impact upon the financial fortunes of city residents. Still, if a federal § 1983 case were to arise every time a city resident felt that he or she was harmed by such a municipal officer's incorrect decision, then federal courts would be clogged with such cases. The fact that federal courts are not, in fact, clogged with such matters provides further indication of the stringent standards which exist in this context.

Having made generalized observations regarding the stringent constitutional standards which apply in this context, this court agrees with and adopts the City's more specific arguments relating to why its actions in this case did not rise to the level of a constitutional violation. This is, once again, a purely cumulative basis for dismissing plaintiffs' federal claims in this case,

19

since they lack a basis under *Monell* for holding the City liable for any constitutional violation which even allegedly might have occurred in this case.

Having dismissed plaintiffs' federal claims, this court now turns to their remaining state law claim, for tortious interference with contract. This court does not believe that plaintiffs have seriously contested the City's arguments in this context, which is as follows:

> DBS brings a tortious interference claim against the City only. Such claims fall under the Mississippi Tort Claims Act ("MTCA"). Under the MTCA, sovereign immunity bars any claims against the City involving an element of malice. *See* Miss. Code §§ 11-6-5(2), 11-46-7(2) ("For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense."). Tortious interference claims require an element of malice. *See Springer v. Ausbern Construction Co.*, 231 So. 3d 980, 988 (Miss. 2017). As such, it cannot be brought against the City as sovereign immunity has not been waived. *Jones v. Miss. Institutions of Higher Learning*, 264 So. 3d 9, 33 (Miss. Ct. App. 2018) ("Such a claim may be brought against a government employee in his individual capacity[.]").

[City's Brief at 7]. In response, plaintiffs write in their brief that:

> The City separately asserts MTCA immunity because Mississippi describes malice as an element of tortious interference. Plaintiffs preserve their position that municipal liability turns on the nature of the governmental conduct alleged and the proper application of Mississippi Code §§ 11-46-5 and 11-46-7. But even if the Court concludes that the City retains immunity from this state-law claim, that conclusion does not dispose of the federal claims.

[Plaintiffs' brief at 15].

Plaintiffs' response strikes this court as being as close to a concession of the City's arguments as they could have made, without expressly doing so. Indeed, plaintiffs' argument that "municipal liability turns on the nature of the governmental conduct alleged and the proper application of Mississippi Code §§ 11-46-5 and 11-46-7" is essentially meaningless, since they offer no actual arguments explaining how holding a City liable for a malice-based tort would be consistent with those statutes. The City is clearly correct in noting that §§ 11-6-5(2) and 11-46-

20

7(2) each provide for individual, not municipal, liability for torts based on "malice" and plaintiffs do not attempt to argue otherwise. The amended complaint cites "Oxford's malicious intent to permanently prevent DBS from completing its contract with SDT," *id.* at 10, but it is clear that the MTCA protects the City from any state law liability for any such alleged acts of malice by its employers. It thus seems clear that plaintiffs lost any right to assert a tortious interference with contract claim when they voluntarily dismissed the individual defendants in this case, and the City's motion to dismiss plaintiffs' state law claim against it, much like their federal claims, is well taken and due to be granted.

It is therefore ordered that defendant's motion for summary judgment is granted, and plaintiffs' motion to strike certain portions of that motion is dismissed as moot.[4]

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

This, the 7th day of August, 2026.


   /s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI

---

[4] In so ruling, this court notes that its ruling today is dependent upon the general principles of law stated above and plaintiffs' failure to establish potential liability based upon those standards. Striking the portions of defendant's brief to which plaintiffs object would have no impact upon its ruling today.

21